FILED
United States Court of Appeals
Tenth Circuit

August 15, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

JOHN MARION GRANT,

    Petitioner-Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,[*]

    Respondent-Appellee.

No. 11-5001

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:05-cv-00167-TCK-TLW)

Thomas Kenneth Lee, Assistant Federal Public Defender, Oklahoma City, Oklahoma (Thomas Hird, Assistant Federal Public Defender, with him on the briefs) for Petitioner-Appellant.

Jennifer J. Dickson, Assistant Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma (E. Scott Pruitt, Attorney General for the State of Oklahoma, with her on the brief) for Respondent-Appellee.

Before **BRISCOE**, Chief Judge, **GORSUCH** and **HOLMES**, Circuit Judges.

**GORSUCH**, Circuit Judge.

---

[*] Pursuant to Fed. R. App. 43(c)(2), Anita Trammell, who was appointed Warden of the Oklahoma State Penitentiary on February 28, 2013, is automatically substituted for Randall G. Workman as Respondent in this case.

_____

While serving a long sentence in state prison for a series of armed robberies, John Grant won a job as a kitchen worker. The job brought him under the supervision of Gay Carter, a civilian prison employee, but it wasn't one that lasted very long. Mr. Grant was soon fired after he was caught fighting with another inmate — and Mr. Grant didn't take getting fired very well. He came to bear a grudge against Ms. Carter, a woman he used to get along with and even considered a friend.

Seeing Ms. Carter one day during a morning breakfast service, he told her, "I'll get you, bitch." The next morning he followed up, "You're mine." Mr. Grant then proceeded to make good on his threats. After breakfast, he lingered in the dining hall with no obvious purpose, but not altogether out of place either because he used to work there. After about ten or fifteen minutes, Ms. Carter passed near him and he grabbed her, put a hand over her mouth, and dragged her into a small closet. With a shank he had secreted into the dining hall, Mr. Grant stabbed Ms. Carter, sixteen times in all.

The State of Oklahoma charged Mr. Grant with first degree murder and sought the death penalty. At trial, the government had little trouble proving that it was Mr. Grant who stabbed Ms. Carter to death. In his defense, Mr. Grant testified that he had no recollection of killing or wanting to kill Ms. Carter. A defense expert also testified that Mr. Grant suffered from borderline personality

disorder, though the expert added that Mr. Grant was of average intelligence and didn't show any signs of an organic brain disorder. The expert also refused to offer any view on whether Mr. Grant did or didn't understand the consequences of his acts at the time of the murder. In the end, the jury found Mr. Grant guilty as charged.

At the penalty phase, the government argued that Mr. Grant deserved the death penalty on the basis of three aggravating factors surrounding the murder: (1) he had been convicted previously of violent felony offenses, (2) he murdered Ms. Carter while serving a felony prison sentence, and (3) he posed a threat of future violent criminal acts. By this point in the proceedings, the first two factors weren't in much dispute. For its case on the third, the government pointed to other prison fights Mr. Grant had been involved in, including a fight with a prison guard; pointed to the fact that Mr. Grant killed a civilian kitchen worker while in prison; and argued that the evidence suggested he might well strike at prison workers or inmates again.

The defense responded that any threat Mr. Grant posed could be mitigated with adequate care. A psychiatrist explained that Mr. Grant had not received mental health counseling or anti-psychotic medications in prison, though he then refused to speculate whether and to what extent Mr. Grant would benefit from either. Mr. Grant also briefly recounted for the jury his troubled childhood.

In the end, the jury found in the government's favor on all the aggravating factors, found no mitigating factors outweighing those aggravating factors, and voted to impose the death penalty. The Oklahoma Court of Criminal Appeals (OCCA) denied relief on appeal. *See Grant v. State* (*Grant I*), 58 P.3d 783 (Okla. Crim. App. 2002); *Grant v. State* (*Grant II*), 95 P.3d 178 (Okla. Crim. App. 2004). Neither did the OCCA find relief warranted in two separate post-conviction proceedings Mr. Grant attempted. *See Grant v. State*, No. PCD-2002-347, slip op. (Okla. Crim. App. Apr. 14, 2003); *Grant v. State*, No. PCD-2006-690, slip op. (Okla. Crim. App. Nov. 6, 2006).

Mr. Grant then filed a habeas petition in federal court but the district court denied relief, too. *See Grant v. Workman* (*Grant III*), No. 4:05-cv-0167-TCK-TLW, 2010 WL 5069853 (N.D. Okla. Dec. 2, 2010). The district court did, however, issue Mr. Grant a certificate of appealability that allowed him to bring his case to this court. Mr. Grant's certificate allows us to review the district court's decision on the five grounds we discuss below. Ultimately, we agree with all the courts that have come before us and hold none warrants relief.

I

We begin with the question whether the guilt phase jury instructions satisfy the demands of federal due process doctrine. In *Beck v. Alabama*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment sometimes requires a state charging a defendant with a capital offense to permit the jury to

- 4 -

consider alternative, lesser included offenses that do not carry with them the prospect of a death sentence. 447 U.S. 625, 627 (1980); *see also Schad v. Arizona*, 501 U.S. 624, 647 (1991). In this case, Mr. Grant was charged with and convicted of first degree murder. He argues that the state court trying him violated *Beck* by failing to give the jury the option of finding him guilty instead of the lesser included — and noncapital — offenses of first degree manslaughter and second degree murder. But we soon encounter two difficulties with this submission.

The first is that Mr. Grant never asked for a lesser included jury instruction at trial. This is a problem because in *Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999), "we h[e]ld that a state prisoner seeking federal habeas relief may not prevail on a *Beck* claim as to a lesser included instruction that he or she failed to request at trial." *Id.* at 1234. The requirement of a contemporary request isn't one with roots, as one might imagine, in state procedural law. The *Hooks* rule is federal in nature, an explanation of what's required as a matter of federal due process doctrine to invoke *Beck*. As *Hooks* explained, "a proper request for a lesser included instruction [is] an essential requirement under the federal rules," and "[g]iven principles of comity, . . . this rule applies with even greater force when [a federal court] sit[s] in review of a state conviction in a § 2254 action." *Id.* at 1235, 1234 (internal quotation marks omitted). Simply put, this court won't impose a requirement on sovereign states that we don't impose on the federal

courts under our direct supervision. So a state generally won't be said to offend a defendant's due process right to particular jury instructions when it has no occasion to refuse a request for them. *See id.* at 1234 ("In such cases, . . . it is the defendant him or herself that precludes the jury from considering a non-capital option . . . .").

Mr. Grant replies that the portion of *Hooks* claiming to hold this much — section III.C of the opinion — doesn't really contain a holding at all. He points out that two judges concurred separately, indicating they joined all but section III.C of the main opinion in *Hooks*. *Id.* at 1241 (Anderson, J., concurring). For its part, Oklahoma rejoins that the separate concurrence took issue with *other* aspects of section III.C, not this one — and that, properly viewed, the panel was unanimous on the need for a defendant to request a lesser included offense instruction to trigger *Beck*.

At the end of the day, who's right about the optimal reading of *Hooks* doesn't much matter. It doesn't because since *Hooks* issued this court has expressly and repeatedly held that "a state prisoner seeking federal habeas relief may not prevail on a *Beck* claim as to a lesser included instruction that he or she failed to request at trial." *Thornburg v. Mullin*, 422 F.3d 1113, 1126-27 (10th Cir. 2005); *see also Darks v. Mullin*, 327 F.3d 1001, 1007 (10th Cir. 2003) (the "[f]ailure to request such an instruction precludes a petitioner seeking habeas relief from prevailing on a *Beck* claim"); *Hogan v. Gibson*, 197 F.3d 1297, 1303

n.3 (10th Cir. 1999) (same); *Smith v. Gibson*, 197 F.3d 454, 464 (10th Cir. 1999) (same). The point is by now long settled in this circuit and by many more cases than just *Hooks* itself. At this late date we simply do not see how we might hold otherwise.

Mr. Grant replies by directing us to the OCCA's decision in *Shrum v. State*, 991 P.2d 1032 (Okla. Crim. App. 1999). As Mr. Grant sees it, *Shrum* requires Oklahoma state courts, as a matter of state law, to provide lesser included offense instructions in capital cases always and automatically. Because of this, he suggests, *Shrum* relieved him of any duty to request a lesser included offense instruction at trial.

This suggestion, however, fails on its own terms. One premise on which Mr. Grant's argument depends raises some interesting questions. His argument surely rests on the (if entirely implicit and unexplored) premise that *state law* can relieve a party of its duty under *federal law* to invoke a federal right. Whether this premise is sound undoubtedly warrants investigation. But there's no need to tangle with that project in this case. No need because *another* premise on which Mr. Grant's argument rests has problems of its own. *Shrum* relieves defendants of their obligation to request lesser included offense instructions only as a matter and for purposes of *state law*. Oklahoma still requires defendants who wish to assert *federal* constitutional complaints about proposed jury instructions to raise them in a timely fashion with the trial court. *See, e.g.*, *Barnard v. State,* 290 P.3d

- 7 -

759, 769 (Okla. Crim. App. 2012); *Warner v. State*, 144 P.3d 838, 881 (Okla. Crim. App. 2006); *McGregor v. State*, 885 P.2d 1366, 1384 (Okla. Crim. App. 1994). This includes federal *Beck* claims in particular: Oklahoma expressly requires defendants who wish to raise *Beck* claims to make "specific objection[s] to the instructions administered or request alternative instructions" they believe will satisfy *Beck. Douglas v. State*, 951 P.2d 651, 672 (Okla. Crim. App. 1997). So it's plain enough that at least one essential premise on which Mr. Grant's argument depends — that Oklahoma has sought to relieve him of his burden to press a federal entitlement to a lesser included charge under *Beck* — is simply wrong.[1]

A second and entirely independent problem confronts Mr. Grant's *Beck* argument. Even overlooking his failure to object before the state trial court, the argument fails on its merits. As *Beck* explained, federal due process doctrine does *not* require a lesser included offense instruction to be given *unless* "the evidence would . . . support[] . . . a verdict" on that lesser included offense. 447 U.S. at 627. In this case, the OCCA didn't assess *Beck* directly but it did reject

---

[1] Of course, what due process doesn't compel the Sixth Amendment still might. A defendant's failure to seek a lesser included offense instruction may not trigger *Beck*, but if the failure was the product of defense counsel's deficient performance and if that failure turns out to be prejudicial to the defendant, that could form the basis for a Sixth Amendment ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). We recognized this possibility in *Hooks*. 184 F.3d at 1235 n.29. But here, as there, we are confronted with no ineffective assistance claim on this question.

Mr. Grant's claim that he was automatically entitled to lesser included offense instructions as a matter of *state law* under *Shrum*, and it did so on precisely these grounds, holding that no lesser included instructions were required under *Shrum* because the evidence adduced at trial could not rationally support a verdict for either first degree manslaughter or second degree murder. Because *Beck*, like *Shrum*, does not require lesser included offense instructions when the evidence is insufficient to support a verdict on them, the OCCA's state law conclusion under *Shrum* — if correct — would also spell the end to any effort to secure federal relief under *Beck*.

The OCCA's conclusion turns out to be correct. In so holding, we are mindful of the limits of our authority as a federal court reviewing the work of a state court. When it comes to the question what is required as a matter of law to establish a manslaughter or second degree murder charge, we may not second guess Oklahoma authorities. Matters of state law are theirs, not ours, to answer. *See* 28 U.S.C. § 2254(a); *Boyd v. Ward*, 179 F.3d 904, 916 (10th Cir. 1999). Further, in the course of rejecting Mr. Grant's state law *Shrum* argument, the OCCA made certain factual findings. In our own *Beck* analysis we are obliged to presume those findings are correct unless and until shown to be erroneous by clear and convincing evidence, as indeed a federal court sitting in review of a state court in collateral proceedings must always do. *See* 28 U.S.C. § 2254(e)(1); *Hooks*, 184 F.3d at 1231. At the same time, because the OCCA didn't purport to

rule, as a legal matter, on a federal *Beck* claim but only on a different (if related) state *Shrum* claim, and seeking to afford Mr. Grant the benefit of the most generous standard of review we can, we assess *de novo* the legal question under *Beck*, asking whether a jury could "rationally . . . find [the defendant] guilty of the lesser offense and acquit him of the greater." *Hogan*, 197 F.3d at 1307.[2]

With these points in mind we turn first to the question of manslaughter. As a matter of state law, the OCCA explained that a conviction for first degree manslaughter under Oklahoma state law "requires that a person act with a 'heat of passion' caused by 'adequate provocation.'" *Grant I*, 58 P.3d at 795 (quoting Okla. Stat. Ann. tit. 21, § 711). The court then proceeded to explain that it could find in the record "[n]o evidence . . . to support either of these elements" and for that reason held no manslaughter instruction was required. *Id.* Before us, Mr. Grant doesn't point to any facts suggesting (let alone clearly compelling the inference) Ms. Carter did anything to him that was "calculated to provoke an

---

[2] Since this case was argued the Supreme Court has instructed us to apply a rebuttable presumption that a "federal claim was adjudicated on the merits" even when "a state court rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). Presuming this much would preclude the application of *de novo* review of the legal question under *Beck* and trigger instead the application of § 2254(d)'s additional layer of deference to the OCCA's decision, making Mr. Grant's task in this case all the more difficult. Because Mr. Grant hasn't had a chance to address the potential application of *Johnson* and because he loses whether or not § 2254(d) applies, our analysis here assumes without deciding that *Johnson*'s "presumption of merits adjudication" has been rebutted. *See id.* at 1096-97.

- 10 -

emotional response" or that would "ordinarily cause serious violence" — actions that under Oklahoma law amount to "adequate provocation." *Washington v. State*, 989 P.2d 960, 968 n.4 (Okla. Crim. App. 1999). Neither does Mr. Grant direct us to facts suggesting that he acted in the "heat of passion" — namely, that the "homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool." *Davis v. State*, 268 P.3d 86, 111 (Okla. Crim. App. 2011). In these circumstances, we must respect the OCCA's factual finding about the state of the record and from that finding it's plain as a matter of federal law that a first degree manslaughter charge was not required.

It is likewise evident that a second degree murder charge was not warranted by the evidence. Under Oklahoma law, a second degree murder conviction is permissible only when the defendant acts "without *any* premeditated design to effect the death of any particular individual." *Williams v. State*, 22 P.3d 702, 712 (Okla. Crim. App. 2001) (emphasis added). The OCCA found that the evidence in the record strongly suggested some degree of premeditation: Mr. Grant bore a prison-made shank, he threatened Ms. Carter twice in two days, he waited for Ms. Carter to come near the closet, and then he forced her into the closet, covered her mouth, and stabbed her repeatedly near her vital organs. *See Grant I*, 58 P.3d at 795. Neither, the OCCA found, was there evidence in the record that Mr. Grant "suffered mental infirmities that would have rendered him incapable of forming the specific intent necessary" for first degree murder. *Id.*

Mr. Grant challenges these findings. He says his testimony showed "he was in a dazed state of mind" at the time of the incident and couldn't remember committing the murder. He reminds us that there was a video taken shortly after the murder that showed him highly agitated. And he points out that his expert believed he suffered from borderline personality disorder.

None of these facts, however, clearly and convincingly unseats the OCCA's finding that all of the evidence surrounding the killing suggested a degree of premeditation. Neither do they undermine its finding that the record lacked evidence suggesting Mr. Grant suffered mental infirmities that rendered him incapable of forming an intent to kill, especially given that his own expert refused to say Mr. Grant couldn't understand right from wrong. Indeed, were we to consider the factual questions ourselves, without the layer of deference due under § 2254(e), we would reach the same view about them as the OCCA did. We simply cannot say that, given the facts in this record, a rational jury could have found that Mr. Grant acted "without *any* premeditated design" to kill Ms. Carter.[3]

---

[3] Mr. Grant points out that the trial court granted his request for an insanity instruction. But that *legal* instruction doesn't answer the *Beck* question whether the *facts* in the record supported anything other than a first degree murder conviction. Indeed, if the trial court's decision to provide that legal instruction suggests anything, it is that the trial court was generous to Mr. Grant given that even his own expert declined to testify that he was legally insane (unable to tell right from wrong) at the time of the killing.

Mr. Grant also argues that the OCCA violated *Beck* by focusing on the wrong question, asking whether the government's evidence was sufficient to

(continued...)

## II

Mr. Grant contends the state trial court violated his Sixth Amendment Confrontation Clause rights. During the guilt phase, the government called Dr. Frederick Smith, a psychologist. Dr. Smith testified that he examined Mr. Grant a few days after the murder and found no serious mental health problems at that time. During cross examination, the defense responded with an aggressive attempt to discredit Dr. Smith — and in doing so got Dr. Smith to admit that he spent at most twenty minutes with Mr. Grant, and that he did not know whether Mr. Grant was of sound mind at the moment he killed Ms. Carter. Defense counsel wanted to ask Dr. Smith, too, about an out-of-court report prepared by another psychologist, Dr. Elliot Mason, relating yet another out-of court-statement by Mr. Grant a few days after the murder. Before counsel could get there, however, the trial court held that any questioning about Dr. Mason's report

---

[3](...continued)
support a conviction for first degree murder rather than whether it permitted a conviction for second degree murder. But here again Mr. Grant simply misreads the OCCA's opinion. As we've seen, the OCCA wasn't purporting to apply *Beck* at all but state law (*Shrum*). Besides, while the OCCA *did* comment on the sufficiency of the government's case to sustain a first degree conviction, *see Grant*, 58 P.3d at 795 ("In this case, the evidence clearly establishes a premeditated design to kill."), it *then* proceeded to hold as well that the evidence "simply d[id] not support a finding that [Mr. Grant] acted without a premeditated design to effect death." *Id.*; *see also id.* ("[W]e do not ask a jury to consider a lesser offense if *no jury could rationally find* both that the lesser offense was committed and the greater offense was not." (emphasis added)). And *this* determination — one we entirely agree with for reasons we've already explained — properly forecloses Mr. Grant's *Beck* claim.

was outside the scope of Dr. Smith's direct examination. This, Mr. Grant says, wasn't true and the trial court's failure to permit the inquiry violated his Sixth Amendment right to confront his accusers.

The OCCA agreed with Mr. Grant that the trial court erred. But it proceeded to deny relief on the ground that the error was harmless beyond a reasonable doubt. "The failure to allow cross-examination on this single, self-serving statement made three days after Grant murdered the kitchen worker and contained in a second-hand report," it held, "had no impact on the jury's determination of guilt or the sentence in this case." *Grant I*, 58 P.3d at 795.

As a federal court sitting in collateral review of a state court's work, we may not reverse the OCCA's determination that a constitutional error was harmless beyond a reasonable doubt unless we can be sure for ourselves that the error had a "'substantial and injurious effect' on the jury's decision." *Banks v. Workman*, 692 F.3d 1133, 1139 (10th Cir. 2012) (citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007)). "This standard precludes reversal of a conviction on habeas unless we have a grave doubt about the effect of the error on the verdict." *Id.* (internal quotation marks omitted).

That much we cannot say. Dr. Mason's report was hearsay. Mr. Grant's putative statement contained within it (being offered by Mr. Grant himself) was hearsay within hearsay. As Mr. Grant's present counsel conceded at oral argument before us, the defense could have lawfully used such hearsay materials

*only* to impeach Dr. Smith, not as substantive evidence with respect to any aspect of the case. *See Mackey v. State*, 526 P.2d 1161, 1165 (Okla. Crim. App. 1974) ("Evidence to prove a substantive fact cannot be introduced by a purely hearsay statement under the guise of impeaching a witness."). Neither do we see how questioning Dr. Smith about the report could have had any material additive effect in his impeachment. From cross-examination the jury already knew that Dr. Smith performed only a brief examination of Mr. Grant and that his diagnosis was at best tentative. Anything Dr. Smith admitted about overlooking statements contained in Dr. Mason's report would have been cumulative of points already well made on cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).[4]

## III

During the penalty phase, the government introduced two "victim impact" statements. Ms. Carter's daughter wrote that she had hoped to follow in her mother's footsteps by pursuing a career in the corrections field, but that her

---

[4] We are confident the error could have had little impact on the outcome for still other reasons. As we have already seen, the State's evidence of Mr. Grant's premeditation at the guilt stage was strong, quite independent of anything Dr. Smith had to say: the evidence showed advance planning and threats, and even Mr. Grant's own expert at the guilt phase couldn't say he failed to understand the consequences of his actions. By the time of the penalty phase, the defense abandoned altogether any contention that the murder was the result of psychotic delusions and focused instead on Mr. Grant's personal history and amenability to treatment, making the error all the more immaterial to the proceedings.

mother's death caused her to doubt herself. Ms. Carter's brother wrote that his sister had been kind and loving; he added that he missed his sister and had trouble sleeping at night. Both statements concluded by asking the jury to impose the death penalty.

While victim impact statements may be admissible for other purposes, this court has understood the Supreme Court to have banned their use to the extent the statements expressly request a death sentence. *See, e.g.*, *Lockett v. Trammel*, 711 F.3d 1218, 1236 (10th Cir. 2013); *see also Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991); *Booth v. Maryland*, 482 U.S. 496, 508 (1987). There is no question, then, that the introduction of the victim impact statements in this case was plainly erroneous as a matter of federal law to the extent the statements included a plea for the death penalty.

At the same time, we cannot say the error in this case was sufficient to warrant reversal. To reverse we must be able to say (once again) that the error had a "substantial and injurious effect," one leaving us with a "'grave doubt' about the effect of the error on the jury's verdict." *Selsor v. Workman*, 644 F.3d 984, 1027 (10th Cir. 2011). Here, two things, taken together, persuade us that standard isn't met.

First is the nature of the evidence at the penalty phase against Mr. Grant. The government's presentation on two aggravating circumstances was all but indisputable and its evidence on the third and perhaps most important aggravating

circumstance — Mr. Grant's potential for continued dangerousness even if incarcerated — was potent. The government showed that Mr. Grant had a history of violent felonies well before the murder; it showed that he was fired from his position on the prison dining staff for fighting with another inmate; it showed that he had engaged in still other fights while in prison, including with a prison guard; and it showed, of course, that he killed a prison employee who was previously his friend. All of this suggested that Mr. Grant would continue to pose a danger to others, including civilian prison workers, even while he remained imprisoned. To be sure, Mr. Grant did respond with evidence of his amenability to treatment and evidence about his troubled childhood. But even viewed in its totality the case against him remained considerable. *See Welch v. Workman*, 639 F.3d 980, 1003 (10th Cir. 2011) (finding victim impact statements harmless where, among other things, "the evidence supporting the three aggravating factors . . . provided strong support for a death sentence").

Second is the nature of the particular statements before us. They conclude with the line, "I believe [John Grant] should be given [or should receive] the death penalty." No other embellishment is made on the subject. This court has held far more extensive pleas to lack the required "substantial and injurious" effect on a jury's verdict when the evidence against the defendant at sentencing was strong. *See, e.g.*, *DeRosa v. Workman*, 679 F.3d 1196, 1236 (10th Cir. 2012) (ruling harmless a statement that "[o]ur family has suffered enough because of

this man. My family pleads with you to give the death penalty."); *Welch*, 639 F.3d at 1000 (ruling harmless a statement that "[w]e can now only put our faith first in God and then our courts, and you, the jury. And I would beg you, please, don't let this happen to another family. And, again, I say I feel that he should be imposed the death penalty."); *Welch v. Sirmons*, 451 F.3d 675, 701 (10th Cir. 2006) (noting five separate requests for the death penalty). Given that this case contains similarly strong evidence against the defendant and yet a comparatively muted pair of pleas, we are hard pressed to see how we could, faithful to our precedent, find the admission of the statements here reversible error.

IV

Mr. Grant charges his trial lawyer with doing a poor job of investigating and presenting evidence about his background at the penalty phase. To prevail on a Sixth Amendment claim of ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that (1) counsel "committed serious errors in light of 'prevailing professional norms' such that his legal representation fell below an objective standard of reasonableness," and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009) (discussing *Strickland*, 466 U.S. at 688, 694).

The OCCA held that Mr. Grant's claim failed at both steps. On the question of deficient performance, the OCCA held that defense counsel's alleged

failure to investigate and present more evidence about Mr. Grant's background was actually Mr. Grant's fault, not his counsel's, because Mr. Grant prohibited counsel from contacting his family members. On the question of prejudice, the OCCA held that none of the evidence Mr. Grant says his counsel should have uncovered was sufficiently powerful that it would have made a difference.

The federal district court agreed in part and disagreed in part. It held that the OCCA's deficient performance analysis was based on a clear error of fact. As the district court saw it, Mr. Grant never prevented his lawyer from contacting his family and the OCCA's factual findings otherwise could not stand even under the lenient standard of review dictated by § 2254(e)(1). Correctly understood, the district court said, the facts suggested deficient performance. Even so, the district court agreed with the OCCA that the facts did *not* suggest prejudice because the evidence Mr. Grant's lawyer could have found and presented about his client's background was not reasonably likely to have made a difference to the outcome.

Before us, the State doesn't dispute the district court's assessment in any way but one. The district court assessed the question of prejudice *de novo*. In the State's view, however, we must review the prejudice question through the deferential prism of § 2254(d). Meanwhile, Mr. Grant insists just the opposite. He suggests that the State's failure to contest the district court's finding of factual error on the deficient performance question requires us to review the prejudice question *de novo*.

The State is correct. This court has already held that when a state court's deficient performance "analysis [is] 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' we [are] still . . . bound to defer to [its] prejudice analysis under *Strickland*'s second prong." *Lott v. Trammell*, 705 F.3d 1167, 1214 (10th Cir. 2013) (quoting 28 U.S.C. § 2254(d)(2)). This much follows from the text of § 2254(d). That provision requires federal courts to defer to a state court's decision on a defendant's claim unless "the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). And even when a state court's *decision* on *Strickland*'s first prong (deficient performance) is affected by an unreasonable determination of the facts, that does not necessarily mean its *decision* on *Strickland*'s second prong (prejudice) is similarly affected. This case illustrates why. By its very nature, any factual error the OCCA might have made in finding that Mr. Grant forbade counsel from contacting his family goes only to the question of deficient performance: whether counsel should or should not have done more to investigate Mr. Grant's background. By the point the OCCA reached the second and separate *Strickland* question of prejudice, it had to and did assume that counsel *was deficient* in failing to contact family members. By that point, the OCCA had to and did ask only whether that *presumed deficiency* was prejudicial. Put differently, it is not possible to say the OCCA's *decision* on the prejudice

question was *based on* its putatively unreasonable factual determination that Mr. Grant forbade counsel from contacting his family, a factual determination that could have pertained only to the deficiency question.

We can thus say this about the standard of review binding us in this case. Under *Strickland*'s second element, the only element contested before us, Mr. Grant "must show that this deficient performance mattered — namely, that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Wackerly*, 580 F.3d at 1176 (quoting *Strickland*, 466 U.S. at 694). In a system like Oklahoma's, where only a unanimous jury may impose the death penalty, the question is whether it's "reasonably probabl[e] that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). A reasonable probability is one that is "substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011). But because we come at this question on habeas, we may approach it not directly and *de novo* but only indirectly through § 2254(d), asking whether the OCCA's decision that the outcome would *not* have changed but for his counsel's alleged deficiencies is *itself* unreasonable as a matter of fact or federal law. In asking that much narrower question we must, as well, limit our review of the record to the same record that was before the OCCA. *See Cullen v.*

*Pinholster*, 131 S. Ct. 1388, 1398 (2011); *Black v. Workman*, 682 F.3d 880, 895

(10th Cir. 2012).[5]

In seeking to prove prejudice to the OCCA, Mr. Grant produced evidence

from family members suggesting they had been prepared to testify during the

penalty phase that Mr. Grant grew up poor, one of nine kids raised by a single

mother who depended on social assistance. In his early years, Mr. Grant had been

a quiet, sweet young boy with a fondness for dogs, football, and cars. But as Mr.

Grant got older, things took a turn for the worse. He started hanging around with

the wrong crowd and frequently found himself in trouble with the law, mostly for

stealing (sometimes, his siblings insisted, for their benefit). He spent time

incarcerated at juvenile facilities, an experience that intensified his relationships

with friends who were up to no good. None of his other family members spent

---

[5] In connection with his *Strickland* claim, Mr. Grant asks us to consider new evidence he has offered for the first time only in these federal court proceedings. The evidence consists of affidavits from a family member, a friend, a psychiatrist, and a self-described "mitigation specialist" who researched Mr. Grant's childhood. But our review under § 2254(d) is limited to the same "record that was before the state court." *Black*, 682 F.3d at 895. In other words, a federal court cannot hold a state court decision to be legally or factually unreasonable in light of evidence the state court never saw. *Id.* Admittedly, in other circumstances "state prisoners may sometimes submit new evidence in federal court," *Pinholster*, 131 S. Ct. at 1401 — though our case law has yet to clarify precisely when. Yet even if we were to view this case *de novo* on the amended record Mr. Grant now presents, our conclusion would not be any different. The new evidence is for the most part cumulative of the state court record. In places, as well, it would seem to do Mr. Grant as much if not more harm than good. There are indications, for example, that Ms. Carter feared Mr. Grant even before the murder, that Mr. Grant started using "PCP or harder drugs" as an adolescent, and that Mr. Grant to this day "suffers from . . . outbursts of anger."

significant time in prison and most couldn't comment on what Mr. Grant's adult personality was like because they moved away to Oregon when Mr. Grant was a teenager. To be sure, Mr. Grant did send and receive the occasional letter — and make and receive an occasional phone call, too — but never very often in the twenty years Mr. Grant had spent in prison by the time of the murder. His siblings reported visiting only rarely, and less often the longer Mr. Grant was in prison. Only his mother and uncle together made an annual visit, and then only for about an hour each time.

The OCCA concluded that none of this would have made a difference to the outcome of Mr. Grant's penalty phase proceedings. *See Grant II*, 95 P.3d at 181. And we cannot say — as we must to reverse — that the OCCA's conclusion was contrary to, or involved an unreasonable application of federal law, or that it resulted in a decision based on an unreasonable determination of the facts before the state courts.

In seeking to persuade us otherwise, Mr. Grant relies primarily on the Supreme Court's decision in *Wiggins* and similar cases. In *Wiggins*, the Supreme Court faced a *Strickland* claim predicated on a lawyer's failure to conduct a reasonable investigation into the background of his capital defendant client. *See* 539 U.S. at 533-34. In conducting its prejudice analysis, the Court highlighted the "sordid details of [the defendant's] life history" that an investigation would have uncovered. *Id.* at 536. Mr. Wiggins, it turned out, "experienced severe

privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother." *Id.* at 535. Once he secured a place in foster care, things fared no better: "He suffered physical torment, sexual molestation, and repeated rape." *Id.* As the Court saw it, "had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537.

The Supreme Court and this one have found prejudice arising from an attorney's failure to investigate his client's background circumstances in other materially similar circumstances. For example, in *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court relied on many of the same "nightmarish" circumstances that would later move it to find prejudice in *Wiggins*: privation, neglect, and abuse, all to an astounding degree and all in addition to borderline mental retardation. *See id.* at 395 & n.19. In *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007), this court emphasized that counsel failed to realize that the defendant suffered from brain damage, was "borderline mentally defective," and "grew up in poverty, the twelfth child of a physically and emotionally abusive mother" who neglected her children. *Id.* at 1147. In *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004), we noted that the defendant grew up in an "unstable" home and suffered abuse at the hands of his caregiver, two facts the jury never learned in the bare case for mitigation it did hear. *Id.* at 942. Neither did it learn that the

defendant suffered from a brain injury and had the intellect and emotional maturity of a twelve-year old. *Id.* at 941. And in *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012), we emphasized that the defendant suffered from organic brain damage, had a "traumatic and chaotic" childhood, and had been abused by his alcoholic father and neglected by his mother. *Id.* at 1203 n.28; *see also Rompilla v. Beard*, 545 U.S. 374, 390-92 (2005) (finding prejudice in light of the evidence of abuse, poverty, alcoholism, brain damage, and mental impairments counsel unreasonably failed to uncover).

Of course we can only fault the OCCA for failing to abide Supreme Court precedent, not our own. *See* 28 U.S.C. § 2254(d)(1). AEDPA permits reversal only if a state court's decision is contrary to a Supreme Court decision, and "circuit precedent may [not] be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam). But while *Anderson*, *Smith*, and *Hooks* are not controlling for our present purposes, they do suggest successful claims of prejudice involving personal history in capital cases all tend to follow the same general path *Wiggins* laid down. Meanwhile, other cases from our circuit reveal the many different ways in which unsuccessful claims of prejudice involving personal history tend to fail and can find themselves — reasonably — distinguished from *Wiggins* and its kin.

For one, while juries may be moved by "[d]iagnoses of specific mental illnesses . . . , which are associated with abnormalities of the brain and can be treated with appropriate medication," this court has held that evidence suggesting a defendant suffers from "generalized personality orders" may be less powerful. *Wilson v. Sirmons*, 536 F.3d 1064, 1094 (10th Cir. 2008), *aff'd on reh'g sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (en banc). So, for example, in *McCracken v. Gibson*, 268 F.3d 970 (10th Cir. 2001), we thought it "conceivable" but not reasonably likely that evidence suggesting the defendant suffered from borderline personality disorder and bipolar disorder could have helped him avoid the death penalty. *See id.* at 979-80. Likewise, in *Young v. Sirmons*, 551 F.3d 942 (10th Cir. 2008), we held that a defendant could not establish prejudice with evidence that he suffered from "Compulsive Personality Disorder" and committed the murders in question while "under severe emotional distress." *Id.* at 968-69. We didn't think this evidence "provide[d] a compelling or sympathetic explanation for [the defendant's] violent behavior." *Id.*

For another, evidence of childhood abuse or neglect isn't always severe enough to earn a jury's sympathies. In *Pinholster*, the Supreme Court didn't think it was "significant" that the defendant there "always got the worst of it" when he and his siblings were disciplined and that he "didn't get much love" from his "mother and stepfather." 131 S. Ct. at 1410. And our own precedent suggests that a court can sometimes reasonably find mitigating evidence of childhood

abuse outweighed by countervailing "evidence supporting the conviction and evidence supporting multiple aggravating circumstances," such as a record of violent felonies. *Foster v. Ward*, 182 F.3d 1177, 1189 (10th Cir. 1999); s*ee also Lott*, 705 F.3d at 1214; *McCracken*, 268 F.3d at 980; *Walker v. Gibson*, 228 F.3d 1217, 1234 (10th Cir. 2000), *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001); *Smith*, 197 F.3d at 463. It suggests, too, that such evidence is generally less persuasive when a defendant commits the capital offense later in life. *See Boyd*, 179 F.3d at 918.

Even the presence of evidence about mental health problems and abusive family environments doesn't necessarily run only one way: we have said this kind of evidence often possesses a "double-edged nature." *Wackerly*, 580 F.3d at 1178. In *Pinholster*, for example, the Supreme Court thought evidence suggesting that the defendant's family was afflicted with "serious substance abuse, mental illness, and criminal problems" could backfire before a jury, leading it to conclude that the defendant "was simply beyond rehabilitation." 131 S. Ct. at 1410. Our cases have likewise recognized the potential double-edged effect some mental health evidence can have. *See, e.g.*, *Gilson v. Sirmons*, 520 F.3d 1196, 1250 (10th Cir. 2008) (finding no prejudice where expert report would have indicated defendant could not easily conform to social norms because of "impulsivity, poor judgment, and the failure to see or understand the consequences of his actions"); *McCracken*, 268 F.3d at 980 (finding no prejudice

where evidence would have established that defendant could be "unpredictable, moody and impulsive"); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (finding that defendant's evidence could show him to be an "unstable individual with very little impulse control"). And we have recognized that family background can sometimes cut both ways, as well. We explained in *Young*, for example, that the defendant "had a family, including parents, brothers, and sons, that loved and care for him," and that this in some ways made him *more* culpable. 551 F.3d at 968. With a loving and supportive family behind him, it's reasonable to think that a defendant who has committed a heinous crime may be seen by jurors to bear fewer excuses for his actions. *See id.*

Even if a family member's proffered testimony doesn't stand to harm a defendant, it might still invite an opening for harmful questioning from the prosecution. *See, e.g.*, *Pinholster*, 131 S. Ct. at 1410 (noting that "mitigating evidence" may sometimes "expose[]" a defendant "to further aggravating evidence"); *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013) ("[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been."). We saw the potential for that effect in *Davis v. Executive Director of the Department of Corrections*, 100 F.3d 750 (10th Cir. 1996). Although the petitioner in that case could have benefitted from his family's testimony about his "troubled childhood," we thought it just as likely that their

testimony would "open the door to damaging evidence" about past criminal wrongdoing. *Id.* at 761. Likewise, in *Lott*, we didn't think the OCCA was wrong to account for the risk that an expert witness would have to admit on cross-examination some of the less sympathetic facts about the defendant's life. *See* 705 F.3d at 1214. Neither did we think the OCCA unreasonably determined that risk outweighed whatever mitigating effect the expert's discussion of the defendant's background would have. *Id.* And in *Gardner v. Galetka*, 568 F.3d 862 (10th Cir. 2009), we thought it significant that, had the evidence the defendant urged us to consider actually been presented to the jury, the prosecution would have likely told the jury by way of rebuttal about a number of violent acts the defendant had previously committed. *See id.* at 881.

Many of our cases have also refused to find prejudice when the evidence the defendant says counsel should have presented would have been cumulative of the evidence the jury actually heard. *See, e.g.*, *DeRosa*, 679 F.3d at 1221; *Welch*, 639 F.3d at 1013; *Gardner*, 568 F.3d at 880-81. In *DeRosa*, for example, we determined there was no prejudice in part because the mitigating witnesses had actually brought up at trial many of the points trial counsel failed to uncover with his own investigation. *See* 679 F.3d at 1221. And as our discussion in *DeRosa* made clear, the cumulative nature of mitigation evidence is especially problematic when the government's case — either on guilt or for the death penalty — is

strong.  *See id.*; *see also Walker*, 228 F.3d at 1234; *Clayton v. Gibson*, 199 F.3d 1162, 1176 (10th Cir. 1999); *Castro v. Ward*, 138 F.3d 810, 832 (10th Cir. 1998).

In light of these precedents, we cannot agree with Mr. Grant that the OCCA was unreasonable in any respect when it concluded that he was unable to show prejudice.  Mr. Grant's proffered evidence in this case isn't of the kind or quality of that in *Wiggins* and related cases — but seems a good deal more like what's found in those cases where the Supreme Court and this court have refused to find prejudice.  True, Mr. Grant's family could have testified that Mr. Grant grew up poor and disadvantaged.  But there is no evidence before us suggesting organic brain injuries or mental retardation, no evidence of physical abuse before he started down the path of illegal activity, and no evidence his other family members felt the need due to the difficulties of their family life to travel down a similar path.  Noteworthy, too, is that Mr. Grant murdered Ms. Carter when he was 36, well into adulthood.

Mr. Grant's case also tends to run into pitfalls this court has already recognized and we can hardly fault the OCCA's decision as unreasonable for failing to find prejudice in such circumstances.  For one, Mr. Grant's proffered evidence has a clear double edge to it.  While the jury would have learned Mr. Grant grew up poor and suffered abuse after he committed crimes and found himself in juvenile detention, the prosecution could have used that fact to emphasize Mr. Grant was already a criminal by the time he was a teenager and

- 30 -

that none of his many years behind bars had dissuaded him from acts of violence against other prisoners, prison guards, or even prison kitchen staff. *See Grant II*, 95 P.3d at 183 (Lumpkin, J., specially concurring) ("Twenty years of structured incarceration has not been sufficient to ameliorate the defendant's violent tendencies and that is what impacts the average juror as they view the savagery of this attack on an unarmed female food service worker."). While the jury would have learned that Mr. Grant had been a sensitive child and this may have earned the jury's sympathies, it's just as likely it would have made him seem more culpable, proof that Mr. Grant wasn't the type of murderer who lacked the ability to empathize with his victims.

Another pitfall would have been the damaging information the prosecution could have elicited from Mr. Grant's family members on cross-examination. The prosecution could have asked about the fact that Mr. Grant appeared not to maintain any meaningful relationship with his family. It could have asked why, of all Mr. Grant's many siblings, only he wound up in serious trouble with the law. And it could have pressed questions that revealed Mr. Grant's family didn't know much of anything about what kind of man twenty years in prison had turned Mr. Grant into, or bother to stay in close enough touch to find out.

Finally, the family's evidence would have been at least partially cumulative of the evidence counsel did present at trial. Mr. Grant and his guilt stage expert both talked about his difficult childhood. That expert, for instance, revealed to

the jury that Mr. Grant "functionally never knew his father at all," that Mr. Grant "had problems in school" but was "never seen by any kind of school psychologist or clinician," and spent time in a juvenile facility "which has since been closed down for abuse."

Thus far, we have addressed Mr. Grant's challenge to the legal reasoning the OCCA employed in analyzing *Strickland*'s prejudice prong — that is, his attempt at proving the OCCA decision rested on an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1). But Mr. Grant also challenges two factual determinations the OCCA made in connection with its *Strickland* prejudice analysis. *See id.* § 2254(d)(2). Of course, as we've seen, Mr. Grant challenges still other factual findings bearing only on the question of deficient performance. *See supra* pp. 18-21. But when it comes to prejudice, he says the OCCA erred factually in two ways — when it said his turn to crime as an adolescent was a "matter of choice" and when it said his family "would have repeated [his] account of his childhood" if they had testified. In addition to these two factual errors asserted by Mr. Grant, the dissent claims to have spotted a third: a statement by the OCCA that Mr. Grant had no meaningful contact with his family while in prison.

At the outset we note that it's not at all clear that the OCCA's decision on the question of prejudice was actually "based on" any of these findings, as § 2254(d)(2) requires. At least some of these findings arguably concerned only

subsidiary issues that the OCCA mentioned in passing. But even assuming the OCCA's prejudice decision was "based on" all of these findings, another problem quickly arises: none is "unreasonable" within the meaning of § 2254(d)(2). That standard is a "restrictive" one, *Williams*, 133 S. Ct. at 1092, requiring a showing more powerful than that "the federal habeas court would have reached a different conclusion in the first instance," *Wood v. Allen*, 558 U.S. 290, 301 (2010). We do not believe that standard met in this case.[6]

Take the OCCA's finding that Mr. Grant "had no meaningful contact with the family members who would have testified." *Grant I*, 58 P.3d at 800. As it happens, that finding was entirely consistent with the record. Only Mr. Grant's mother and uncle visited Mr. Grant in the years leading up to the murder — and only once a year for an hour each time at that. Indeed, Mr. Grant himself freely concedes to this court that "it is true . . . that [his] family had no meaningful contact with him." Aplt.'s Opening Br. 49.

Consider next the OCCA's determination that Mr. "Grant's childhood . . . was a matter of choice." *Grant II*, 95 P.3d at 180. This may represent an

---

[6] Of course, state court factual findings are entitled to deference not just under § 2254(d)(2) but also under § 2254(e)(1). Just how these two provisions interact when it comes to the review of a state court's factual findings we need not decide. Because we conclude that the OCCA made no unreasonable determination of fact under (d)(2) and because (e)(1) is "arguably more deferential" than (d)(2), *Wood*, 558 U.S. at 301, nothing turns on the difference for purposes of our analysis.

unforgiving view of the facts, one we would not choose to make ourselves, but we can't say it's lacking evidentiary support. Mr. Grant's mother pinned her son's turn to crime at an early age on "skipping school," which she explained "led to getting into trouble." One of Mr. Grant's brothers recounted that Mr. Grant started committing crime not because of the family's circumstances but because he "just basically h[ung] around the wrong crowd and then, you know, [it] kind of snowballed." A sister explained that while Mr. Grant stole in order to provide for his younger siblings, this was only true "sometimes." And out of everyone in Mr. Grant's household, it was only Mr. Grant who was sent to prison or even juvenile detention.

Finally, we aren't persuaded that the OCCA made an unreasonable determination of the facts when it said that Mr. Grant's family would have "repeated" what Mr. Grant had said during the penalty phase of his trial. *See Grant I*, 58 P.3d at 800. To be sure, the family would have added nuance and detail to Mr. Grant's brief recitation of his personal history. But an imperfect or even an incorrect determination of the facts isn't enough for purposes of § 2254(d)(2). *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A determination must be *unreasonable*. And that much we cannot say in this case. Mr. Grant provided a sketch of his background and his family's testimony would have done no more than fill in some gaps — and, as we have seen, to the extent

they would have added anything they would have done so in ways often more harmful than helpful to Mr. Grant.

In the end, we do not question that the evidence Mr. Grant says his lawyer should have presented bears *some* mitigating effect. But in light of the Supreme Court's holdings and our own, we can't say it was unreasonable for the OCCA to hold that Mr. Grant's case falls on the side of the line where the potential mitigating impact of the unproduced evidence might have been "conceivable" but not "substantial" enough to think it would have altered the outcome. *Harrington*, 131 S. Ct. at 792. Neither can we say that any of the factual determinations underlying the OCCA's conclusion on *Strickland*'s prejudice prong were more than just "debatable" but in fact altogether "unreasonable." *Wood*, 558 U.S. at 303. For that matter, we do not believe *de novo* review would yield any different result. As we've seen, this case bears remarkably few similarities to cases in which we found prejudice while in several ways it is indistinguishable from those in which we haven't.

V

That leaves us with Mr. Grant's complaint that, even if the errors he has identified do not warrant reversal individually, they do when considered cumulatively. Mr. Grant's only argument on this score, however, is that "this Court should consider the synergistic effect of all the errors and grant Mr. Grant relief." Aplt.'s Opening Br. 96. Such a perfunctory assertion falls well short of

- 35 -

what's needed to overturn a judgment, let alone one as long-settled and repeatedly reviewed as this one. Even a capital defendant can waive an argument by inadequately briefing an issue, *see Romano v. Gibson*, 278 F.3d 1145, 1155 (10th Cir. 2002), and we break no new ground by holding the same here.

Even if we were to overlook the deficiency of the argument made to us and try to develop a cumulative error theory for Mr. Grant, we would still fail to find enough here to reverse. At first glance, the cumulative error doctrine looks simple enough. This court has said that the task "merely" consists of "aggregat[ing] all the errors that have been found to be harmless" and "analyz[ing] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Only if the errors "so fatally infected the trial that they violated the trial's fundamental fairness" is reversal appropriate. *Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009).

But as easy as the standard may be to state in principle, it admits of few easy answers in application. After all, "it is the rare trial that will be an ideal specimen in all respects, given that even the most well-intentioned trial participants may commit the occasional error." *United States v. Runyon*, 707 F.3d 475, 520 (4th Cir. 2013). Where and how, then, should a court draw the line between what's ordinary (and ordinarily harmless) and what's rare (and

fundamentally unfair)?  Especially when the errors we are called on to accumulate may be very different in kind (incommensurate) and involve separate aspects of the case (guilt versus penalty)?  Our precedent doesn't say except to suggest that wherever the cumulative error line may fall, it is not crossed often.  Indeed, our search turns up only two published cases in the last many years in which this circuit has found cumulative error.  *See Cargle v. Mullin*, 317 F.3d 1196, 1225 (10th Cir. 2003); *United States v. Wood*, 207 F.3d 1222, 1237 (10th Cir. 2000); *see also Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc) ("[T]he possibility of cumulative error is often acknowledged but practically never found persuasive . . . .").

Confusing, too, is what it means to accumulate error.  The task is undoubtedly more subtle than simply counting up the number of errors discovered.  In one case, for example, we thought that the accumulation of as many as six errors insufficient to reverse.  *See Darks*, 327 F.3d at 1019.  We explained that four guilt-stage errors had only "minor significance," neither "significantly strengthen[ing] the State's case [n]or diminish[ing]" the petitioner's case.  *Id.*  We explained, as well, that none of the errors "undermine[d]" the government's evidence of the sole aggravating circumstance at sentencing.  *Id.*  The strength of the aggravator meant there was "no reasonable probability . . . that the jury would have imposed a sentence less than death."  *Id.*  By contrast, in one of the few cases in which we found cumulative error to warrant reversal, we

- 37 -

paid special mind to the fact that the errors had "an inherent synergistic effect." *Cargle*, 317 F.3d at 1221. At the guilt phase of the trial, the errors all went to "two absolutely critical witnesses" for the government. *Id.* As it concerned sentencing, we noted that the errors "greatly inflated" the government's case for the petitioner's guilt, and counsel's ineffectiveness meant there was a "conspicuous absence of counterbalancing mitigation evidence." *Id.* at 1224-25.

To be sure, we don't understand the difference between *Darks* on the one hand and *Cargle* on the other to imply a need for some "synergistic effect" to prevail on a claim of cumulative error. The reason why becomes clear if we understand prejudice in terms of probabilities. One might "accumulate" probabilities by adding them together, taking into account the *disjunctive* probabilities of each error. One might also "accumulate" probabilities by multiplying them and finding reversible error only in the space where all errors are *conjunctively* appearing all at once. If the cumulative error doctrine means anything, it must be that prejudice can be accumulated *disjunctively* — that all a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him. If it were otherwise, the cumulative error doctrine would be a nullity. A finding that one error wasn't prejudicial would necessarily preclude a finding that all of the errors were prejudicial. *See generally* Amos Tversky & Daniel Kahneman, *Extensional Versus Intuitive Reasoning: The Conjunction Fallacy in Probability Judgment*, 90 Psychol. Rev.

293 (1983) (describing the intuition that a conjunction is more probable than its constituents as the "conjunction fallacy").  So while one error may make another error in the same direction more egregious, a defendant can still show cumulative error by accumulating unrelated errors if their probabilistic sum sufficiently undermines confidence in the outcome of the trial.

Even bearing all this in mind, and even approaching the question *de novo*, we could not say the accumulation of the three errors we've identified or assumed (concerning the cross-examination of Dr. Smith, the victim impact statements, and the background mitigation evidence) warrants reversal.  As we have seen, none of the three errors was anything more than modest on its own terms.  Adding them together undoubtedly leads to a somewhat less modest sum.  But even still they do not collectively call into question the compelling case the government put on and they did not rob Mr. Grant of the ability to present anything more than a modest case for mitigation.  Neither was there a synergistic effect that somehow, say, undermined a particular key question in the government's case.  For example, even if Mr. Grant's family had testified at the penalty phase and even if they didn't have to compete with victim impact statements for the jury's sympathies, taken synergistically the jury still would have been left with an at best mixed impression of Mr. Grant's family support structure and social connections.  The further (cumulative) impeachment of Dr. Smith would not have touched on those questions at all, being unusable for any substantive purpose.  In these

circumstances, and given the guidance we have from our precedent, we simply do not see any basis on which we might reverse. *See Bland v. Sirmons*, 459 F.3d 999, 1029 (10th Cir. 2006) (no cumulative error where "evidence supporting . . . aggravating factors was overwhelming and the mitigating evidence weak"); *Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002) ("[T]he strength of the State's case . . . effectively undercut[] [petitioner's] assertion of actionable prejudice . . . .").

Affirmed.

No. 11-5001, <u>Grant v. Trammell</u>

**BRISCOE,** Chief Judge, concurring in part and dissenting in part

I agree with the majority that there is no merit to the two guilt-phase issues raised by Grant, i.e., the lesser-included instruction issue that is discussed in Section I of the majority opinion and the Confrontation Clause issue that is discussed in Section II of the majority opinion. As regards the lesser-included instruction issue discussed in Section I of the majority opinion, I rely on the OCCA's findings and conclusions that no lesser-included instructions were required under <u>Shrum v. State</u>, 991 P.2d 1032, 1036 (Okla. Crim. App. 1999) because the evidence adduced at trial could not rationally support a verdict for either first degree manslaughter or second degree murder. I would not rely on this court's decision in <u>Hooks v. Ward</u>, 184 F.3d 1206, 1234 (10th Cir. 1999) for the proposition that a state prisoner seeking federal habeas relief may not prevail on a <u>Beck</u> claim if a lesser-included instruction was not requested at trial. To be sure, the lead opinion in <u>Hooks</u> states "that a state prisoner seeking federal habeas relief may not prevail on a <u>Beck</u> claim as to a lesser included instruction that he or she failed to request at trial." <u>Id.</u> But that statement was not joined by the remaining two panel members and therefore is not binding on the panel in this case.[1] And while the majority cites to several post-<u>Hooks</u> cases for the same

_____

[1] I would reject this proposition in any event because it fails to take into account the fact that Oklahoma state law imposes a duty on a trial court to

(continued...)

proposition, Maj. Op. at 6-7, all of those cases cite back, erroneously, to the lead opinion in Hooks.  We need not repeat that error here.

I must respectfully part ways with the majority when it comes to Grant's claim that his trial counsel was ineffective for failing to investigate and present available mitigating evidence during the sentencing phase of his trial.  As I will outline below, the Oklahoma Court of Criminal Appeals (OCCA) erred in analyzing both prongs of the two-prong test for ineffective assistance outlined in Strickland v. Washington, 466 U.S. 668 (1984).  The OCCA was plainly wrong regarding several of the facts it relied on in assessing the performance of Grant's counsel.  And its misunderstanding of the mitigating evidence that was actually available for use by Grant's defense counsel in turn colored its decision regarding the question of prejudice.  Reviewing both of those prongs de novo, as we are obligated to do given the OCCA's errors, it is my view that Grant has established that he was deprived of the effective assistance of counsel and is thus entitled to federal habeas relief in the form of a new sentencing proceeding.

---

[1](...continued)
instruct on any lesser-included offense supported by the evidence, regardless of whether the defendant requests such an instruction or not.  Indeed, the OCCA acknowledged that very rule of state law in its decision denying Grant's direct appeal.  Grant v. State, 58 P.3d 783, 795 (Okla. Crim. App. 2002) ("It is the trial court's duty to instruct the jury on all lesser related offenses that are supported by the evidence, even absent a request from a defendant.").  And the OCCA has continued to apply that rule in more recent cases.  See Owens v. State, 229 P.3d 1261, 1266 (Okla. Crim. App. 2010) (concluding that trial court had a duty to instruct on lesser included offense regardless of the parties' requests, theories of prosecution or theories of defense).

Finally, because I would remand for a new sentencing hearing, it is unnecessary for me to express any views regarding the impact of the trial court's erroneous admission of two "victim impact" statements.

I

Before addressing the merits of Grant's ineffective assistance claim, it is useful to first review (a) precisely what occurred during the sentencing phase of Grant's trial, and (b) the procedural history of Grant's ineffective assistance claim on direct appeal.

A. *The sentencing phase of Grant's trial*

During the sentencing phase of Grant's trial, the prosecution presented evidence to support three aggravating circumstances that it had alleged in its bill of particulars: (1) that Grant was previously convicted of three felony offenses involving the use or threat of violence to the person (specifically three prior robbery with firearms convictions, all occurring when he was nineteen years old), (2) that the murder of Gay Carter was committed by Grant while he was serving a sentence of imprisonment with the Oklahoma Department of Corrections (ODOC) on conviction of a felony, and (3) the existence of a probability that Grant would commit future criminal acts of violence that would constitute a continuing threat to society. To begin with, the prosecution expressly incorporated all of the guilt-phase evidence. In turn, the prosecution presented testimony from an ODOC employee who, based on Grant's official ODOC records, confirmed the existence

of Grant's prior criminal judgments and sentences. Lastly, the prosecution presented victim impact testimony from June Prater and Larry Young. Prater, the sister of victim Gay Carter, read into the record a written victim impact statement prepared by the victim's daughter, Pam Carter. Young, a longtime friend of the victim and her family, read into the record a written victim impact statement prepared by the victim's brother, Roy Westbrook.

Grant's lead trial counsel, James Bowen, argued in his opening statement that "Grant suffer[ed] from a severe mental illness which cloud[ed] his reasoning and his ability to control himself and his ability to be in touch with reality," Trial Tr., Vol VI, at 1563, and thus "should not be given the death penalty," id. at 1564. The defense team, comprised of Bowen and attorney Amy McTeer, then proceeded to incorporate by reference all of Grant's guilt-phase evidence, and in addition presented the testimony of two witnesses: Grant and Daryl Shriner, a prison psychiatrist. None of Grant's family members were present or testified on Grant's behalf; indeed, none of them were aware of Grant's trial because they were not contacted by Grant's counsel. Grant testified in summary fashion regarding his childhood, noting that he had five brothers and three sisters and was "somewhere in between in terms of age." Id. at 1565. Grant also noted that he got in trouble with the law as a juvenile and had to go to three different juvenile facilities. Id. at 1566. Grant testified that, in 1980 shortly after he became an adult, he committed three robberies within days of each other, was charged and

pled guilty to those robberies, and was sentenced to a total sentence of 130 years. Id. at 1566-67. Grant apologized to Carter's family, and then testified, as he did during the guilt phase of trial, that he did not have any memory of the murder and did not know why he committed it. Id. at 1568-69. On cross-examination, the prosecution explored in somewhat greater detail Grant's juvenile and adult criminal history. Grant testified that he was twelve years old the first time he was sent to a juvenile facility, but he testified he did not have a recollection of his juvenile crimes. Id. at 1570-71. Grant testified that he was first committed to the custody of the ODOC in 1979 for accessory to burglary and accessory to robbery, and was paroled from ODOC custody in 1980. Id. at 1571. Grant testified that he had been on parole for approximately three months when he committed the three armed robberies that later resulted in his 130-year sentence. Id. at 1572. Grant admitted that he had been in trouble since he had been in the custody of the ODOC, including being in "[u]nauthorized areas and stuff, small stuff," id., and had also been involved in fights in prison, including one altercation with a correctional officer shortly after he was imprisoned in 1980, id. at 1573. Lastly, Grant testified that he had no recollection where the murder weapon came from. Id.

Shriner, a psychiatrist employed at the facility where the murder occurred, testified that he had never talked to Grant, id. at 1582, but instead had reviewed ODOC's mental health files pertaining to Grant. Id. at 1580. Shriner testified

- 5 -

that one of the records in the file recommended that Grant be given certain anti-psychotic drugs, but that there was no indication in any of the other records that Grant had actually been prescribed such medication. Id. at 1583, 1586. Shriner testified that, because he had never evaluated Grant, he did not have a personal opinion regarding whether such drugs would be beneficial to Grant. Id. Shriner also testified that a prison psychiatrist who had seen Grant recommended that Grant take medication for anxiety, but that Grant had refused it. Id. at 1590.

During sentencing-phase closing arguments, the attorneys sparred primarily over the existence of the third alleged aggravating circumstance, i.e., the existence of a probability that Grant represented a continuing threat. The prosecution argued that "[w]ith [Grant's] history from the time he was 15 years old his conduct shows anyone who looks at it that he is capable in the future and quite probably may commit additional violent crimes against people." Id. at 1608. McTeer argued in response that "there exist[ed] at least a question as to . . . Grant's mental stability," and that "[a]n evaluation and/or treatment and medication could in fact render him less dangerous to society." Id. at 1609.

After deliberating, the jury found the existence of all three alleged aggravating factors, including the continuing threat aggravator. The jury in turn fixed Grant's punishment at death for the murder.

*B. Grant's direct appeal*

The procedural history of Grant's ineffective assistance claim is very unusual in certain key respects and thus worth mentioning. Grant, who was appointed new counsel to represent him on direct appeal, alleged in his direct appeal that his defense attorneys were ineffective for failing to investigate and present mitigating evidence from his family members. The OCCA granted Grant's motion for an evidentiary hearing on the claim and remanded the matter to the state trial court. The state trial court conducted an evidentiary hearing, during which Grant's attorneys presented testimony from ten witnesses: attorney Bowen and nine members of Grant's family, including his mother, father, siblings, and a maternal uncle. The hearing was continued to a later date so that the parties could present testimony from three Oklahoma Indigent Defense System (OIDS) investigators that worked on the case: two that worked with Grant's trial counsel prior to trial, and one that worked with Grant's appellate attorneys on the direct appeal. The trial court subsequently allowed the parties to submit that testimony by stipulation. The trial court then issued written findings of fact and conclusions of law responding to specific points outlined by the OCCA in its remand order. Although the trial court found that Grant did <u>not</u> waive the presentation of mitigating evidence from his family members, and that Grant's trial counsel, James Bowen, did little to develop the mitigating evidence, it concluded that Grant was not prejudiced by Bowen's failure to present mitigating testimony from Grant's family members.

On November 18, 2002, the OCCA issued a published opinion affirming Grant's conviction and death sentence. Grant v. State, 58 P.3d 783, 801 (Okla. Crim. App. 2002) (Grant I). The OCCA's decision was not unanimous, however. Judge Chapel filed a dissenting opinion concluding, in pertinent part, "that the failure of defense counsel to investigate and present mitigating evidence from members of Grant's family constituted constitutionally ineffective assistance of counsel and that Grant was prejudiced by this failure." Id. at 808-09. In turn, Judge Chapel concluded that the "case should be remanded for a resentencing proceeding on this basis." Id. at 809.

Following the OCCA's denial of his direct appeal, Grant filed a petition for writ of certiorari with the United States Supreme Court. On October 6, 2003, the Supreme Court granted certiorari, vacated the OCCA's judgment, and remanded the case to the OCCA "for further consideration in light of [its then recent decision in] Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)." Grant v. Oklahoma, 540 U.S. 801 (2003).

In Wiggins, the Supreme Court granted federal habeas relief to a Maryland state capital defendant on the grounds "that his attorneys' performance at sentencing," specifically the attorneys' failure to investigate potential mitigating evidence, "violated his Sixth Amendment right to effective assistance of counsel." 539 U.S. at 519-20. In doing so, the Court emphasized that "[a] decision not to investigate . . . 'must be directly assessed for reasonableness in all the

- 8 -

circumstances,'" id. at 533 (quoting Strickland, 466 U.S. at 691), and "that

'strategic choices made after less than complete investigation are reasonable' only

to the extent that 'reasonable professional judgments support the limitations on

investigation,'" id. (quoting Strickland, 466 U.S. at 690-91).

On remand from the Supreme Court, the OCCA reaffirmed its prior

decision and rejected Grant's claim of ineffective assistance of counsel. Grant v.

State, 95 P.3d 178, 181 (Okla. Crim. App. 2004) (Grant II). Judge Chapel again

filed a dissent, the opening two paragraphs of which stated as follows:

> Some people just can't take a hint. On October 6, 2003, the
> Supreme Court of the United States responded to John Marion
> Grant's petition for a writ of certiorari, arising from this Court's
> rejection of his direct appeal from his capital conviction, by granting
> the petition, summarily vacating the judgment of this Court, and
> remanding the case to this Court, "for further consideration in light
> of Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471
> (2003)." In a capital case like Grant's—with further extensive
> review through the federal habeas corpus process inevitably
> following the direct appeal decision in this Court, and with a
> subsequent opportunity for the United States Supreme Court to
> intervene, through certiorari review of the decision of the United
> States Court of Appeals for the Tenth Circuit—intervention by the
> Supreme Court at this stage of the appellate process is rare and
> remarkable. One would think that this Court would issue a careful,
> thoughtful response. That has not happened.

> The Supreme Court has sent this Court a message, and its
> reference to the Wiggins decision would seem to make interpretation
> of this message a rather simple task. Yet today's Court majority
> chooses to ignore the message, through a pinched and shallow
> interpretation of Wiggins and a determination to maintain its earlier
> ruling. I believe that the Court's current actions will merely serve to
> delay, rather than to prevent, an eventual re-trial of the punishment
> stage of Grant's trial, thereby causing a pointless waste of monetary

and human resources and an unnecessary extension of the stress and anxiety that accompanies all capital cases, for all of the persons affected by them.

Id. at 184 (internal paragraph numbers and footnotes omitted). As in his dissent from the OCCA's original opinion, Judge Chapel concluded that the proper remedy was "to provide Grant with a new capital sentencing, before a jury that is fully informed about the circumstances of the life whose fate they must determine." Id. at 190.

II

Turning now to the merits of Grant's ineffective assistance claim, I believe, for the reasons I shall outline below, that the OCCA erred in its analysis of both prongs of the Strickland test. In turn, reviewing both of these prongs de novo, I conclude that Grant's claim has merit and entitles him to federal habeas relief in the form of a new sentencing proceeding.[2]

A. *The deficient performance prong of the Strickland test*

The majority spends virtually no time discussing the deficient performance prong of the Strickland test, and instead summarily concludes, based upon the

---

[2] In reviewing the OCCA's Strickland analysis, I have followed the guidance afforded us in Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011), by restricting my review to only the record that was before the OCCA when it resolved Grant's ineffective assistance claim. Although I question whether I am bound to do so, I have also limited myself to the same record in conducting my de novo review of Grant's ineffective assistance claim. I note, however, that my conclusions would not change were I to include consideration of the mitigating evidence now cited by Grant that was not before the OCCA at the time of its decision.

- 10 -

State's failure to dispute the district court's analysis on this point, that Grant's trial attorneys performed deficiently in failing to contact and interview the members of Grant's family to determine what mitigating evidence they could provide at the sentencing phase of Grant's trial. Although I fully agree that Grant's trial attorneys performed deficiently, I believe it is necessary to review the OCCA's analysis on this point because that analysis informed (or, more appropriately, misinformed) the OCCA's subsequent analysis of the prejudice prong of the <u>Strickland</u> test.

When it first decided Grant's direct appeal, the OCCA offered the following explanation in support of its conclusion that Grant's lead trial counsel, Bowen, did not perform deficiently:

> During the evidentiary hearing, [lead] trial counsel [Bowen] was asked why he did not call family members as mitigation witnesses. He testified that there were two main reasons. First, Grant told him that he basically had no contact with his family since he left home at the age of fifteen and was incarcerated since the age of nineteen. Grant indicated that he did not know where his family was located other than somewhere in Oregon. Grant told him that he didn't want his family involved in the proceedings. Regardless, Bowen did ask his investigators to try and contact Grant's family. One investigator testified that he was unable to locate Grant's family before trial. Appellant, John Grant, did not testify at this hearing.

> Secondly, Bowen testified that because the family members had no close contact with Grant in some twenty years, their testimony would be of little help. He felt like if they testified about their relationship, they would be vulnerable on cross-examination because they hadn't had any contact with him since he had been incarcerated.

The trial court found, and we concur, that the family members could have been contacted with the use of information located in Grant's prison records and they would have been willing to testify at trial. The trial court also found that the witnesses' testimony would have been cumulative to each other and would not have had a positive impact on the jury. We agree.

. . . .

We find that counsel's performance was not deficient. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Romano v. Gibson, 239 F.3d 1156, 1181 (10th Cir.2001), cert. denied, 534 U.S. 1046, 122 S.Ct. 628, 151 L.Ed.2d 548 (2001). . . . Grant's wish to exclude his family from the proceedings controlled trial counsel's actions in this case.

Trial counsel did present some mitigating evidence including Grant's own testimony and a prison psychiatrist. The prison psychiatrist testified that Grant had never been treated for any mental illness or syndromes.

Grant testified about his childhood, that he had eight brothers and sisters and that he left home, for the first time, at the age of twelve. He testified that he had been in and out of institutions since his teen years. He testified that when he reached the age of seventeen he was sentenced to adult prison and served one year. He testified that once he got out he committed the robberies for which he was incarcerated when this crime took place. He apologized to the family of the victim. The mitigating evidence Grant now claims his attorney was ineffective for not presenting would have repeated Grant's own account of his childhood.

Considering all of the evidence presented at trial and at the evidentiary hearing, we do not believe that trial counsel's conduct was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. The presentation of this evidence would have reinforced Grant's status as a repeat offender who has spent the majority of his life in prison. He has had no meaningful contact with the family members who would have testified. They knew nothing about his conduct in prison. Even

- 12 -

though they testified that they would have asked the jury to spare his life, this would have been expected by the jury and would not have made a difference in the sentence given.

Grant has made no showing that the failure to find his family members and present their testimony at trial was the result of deficient performance, or that the failure rendered his sentence unreliable. See Burger v. Kemp, 483 U.S. 776, 795-96, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). Even if he had shown deficient performance, Grant could not show that he was prejudiced by the failure to present this evidence.

Grant I, 58 P.3d at 799-800 (internal paragraph numbers omitted).

After the Supreme Court granted Grant's petition for writ of certiorari and remanded the case to the OCCA with directions to reconsider Grant's ineffective assistance claim in light of Wiggins, the OCCA reaffirmed its conclusion that Bowen did not perform deficiently:

In our original opinion, we found that counsel's failure to contact family members did not fall "outside the wide range of professionally competent assistance." Grant, 2002 OK CR 36, ¶ 87, 58 P.3d at 800. Furthermore, we held that Grant could not show that the failure to present the testimony of family members rendered his sentence unreliable. Grant, 2002 OK CR 36, ¶ 88, 58 P.3d at 800. Grant could not show that he was prejudiced by counsel's conduct. Id. While counsel could have contacted family members through Grant's prison records, and did ask an investigator to attempt to contact the family, no contact was ever made.

The Wiggins case does not change our decision. Counsel's decision in this case was driven by Grant's own request to not have his family contacted. See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Romano v. Gibson, 239 F.3d 1156, 1181 (10th Cir. 2001). Counsel's concern that the family members' testimony showing care for Grant would be overshadowed by their actions of limited contact during the past twenty years of his life was a valid concern. Counsel's decision was directed by his client. His knowledge of

- 13 -

Grant's early life, through conversations with Grant, would not have been enhanced by interviewing family members. The Court in Wiggins emphasized, "Strickland does not require counsel to investigate every conceivable line of mitigation evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins, 539 U.S. at [533], 123 S.Ct. at 2541. Counsel in this case followed the directions of his client and made a reasonable decision that investigation into Grant's family history by contacting family members was unnecessary. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.

There are probably only few death penalty cases where counsel would not be ineffective for a failure to undertake an independent investigation of a defendant's early life by contacting family members. This is one of them. The factors that make counsel's independent investigation unnecessary was Grant's own desire to not have his family contacted and his twenty years of incarceration prior to this crime.

Grant II, 95 P.3d at 180-181 (internal paragraph numbers omitted).

The OCCA's analysis of the deficient performance prong thus rests on a number of factual findings. To begin with, the OCCA concurred with the state trial court's finding "that [Grant's] family members could have been contacted with the use of information located in Grant's prison records and they would have been willing to testify at trial." Grant I, 58 P.3d at 799; see Grant II, 95 P.3d at 181 ("While counsel could have contacted family members through Grant's prison records, and did ask an investigator to attempt to contact the family, no contact was ever made."). But the OCCA also found that "Grant's childhood . . . was a matter of choice," Grant II, 95 P.3d at 180, and that Grant, as an adult, "ha[d] had no meaningful contact with the family members who would have testified," Grant

- 14 -

I, 58 P.3d at 800.  The OCCA further found that the testimony of Grant's family members "would have repeated Grant's own account of his childhood," id., and "would have been cumulative to each other," id. at 799.  Relatedly, the OCCA found that trial counsel's "knowledge of Grant's early life, through conversations with Grant, would not have been enhanced by interviewing [Grant's] family members."  Grant II, 95 P.3d at 181.  Lastly, the OCCA found that "Grant specifically told counsel that he did not want his family contacted," id. at 180, and that trial counsel "followed the directions of his client."  Id. at 181.

As I shall outline below, all but the first of these factual findings are clearly contrary to, and rebutted by, the record developed during the trial court's evidentiary hearing.[3]

*1) The OCCA's first factual error*

---

[3] I recognize there is a circuit split regarding the precise interplay of 28 U.S.C. § 2254(d)(2), which provides that federal habeas relief can be granted in favor of a state prisoner on the basis of a claim that was adjudicated on the merits in state court proceedings if the state courts' adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," and 28 U.S.C. § 2254(e)(1), which provides that in federal habeas proceedings brought under § 2254, "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  See Wood v. Allen, 130 S. Ct. 841, 848 n.1 (2010) (citing circuit cases that have addressed the issue).  It is unnecessary for us to take a position on that issue in this case because, under any of the various formulations that have been employed by our sister circuits, the OCCA's presumptively correct factual findings have been rebutted by clear and convincing evidence and proven, both individually and collectively, to be unreasonable.

To begin with, the OCCA's characterization of Grant's childhood as a "matter of choice" is clearly erroneous and indeed offensive when viewed in light of Grant's life history, and is also contrary to well-established Supreme Court precedent. According to the testimony of Ruth Grant, Grant's biological mother, Grant was one of nine children, four of whom, including Grant, were fathered by a man named Walter Grant. Shortly after Grant's birth, Ruth testified, Walter Grant left Oklahoma with the two oldest children (Kenneth Grant and Ronnie Grant) and moved to Los Angeles. Ruth was left to raise her remaining children by herself with only part-time work and public assistance as their means of support. When Grant was approximately five years old, Ruth moved herself and her remaining children from Ada, Oklahoma, to Oklahoma City in search of a better job and better living conditions. But as all of Grant's family members agreed, Ruth's quest for better living conditions for her family was not successful. After living for a short time near her brother, Clayton Black, Ruth and her children moved into an apartment in a housing project located in a crime-ridden neighborhood of Oklahoma City. Because of Ruth's work schedule, and because his father had left the family years earlier, Grant and his siblings lacked adult supervision during most of their waking hours. Although it was undisputed that Grant thereafter began associating with a group of juvenile delinquents and in turn got into trouble for stealing, his younger sister Andrea Jean Grant explained that Grant's purpose in stealing was to obtain clothes and shoes for his younger

- 16 -

siblings to wear.  Hr'g Tr. at 81.  And Grant's juvenile offenses resulted in his spending a significant amount of time in several state juvenile facilities, all of which purportedly were in deplorable condition.  Thus, in sum, the essentially uncontroverted factual record firmly establishes that Grant, through no fault of his own, was subjected during his entire childhood to poverty and parental neglect.

Perhaps the OCCA's "matter of choice" statement was aimed more narrowly at Grant's juvenile criminal activities, rather than his entire childhood.  But, even assuming that to be the case, the statement is clearly inconsistent with the more sympathetic views expressed by the Supreme Court regarding juvenile offenders.  In Roper v. Simmons, 543 U.S. 551 (2005), for example, the Supreme Court outlined "[t]hree general differences between juveniles under 18 and adults."  543 U.S. at 569.  "First," the Court stated, "as any parent knows and as the scientific and sociological studies . . . tend to confirm, [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions."  Id. (internal quotation marks omitted).  "The second area of difference," the Court noted, "is that juveniles are more vulnerable or susceptible to negative influences and outsides pressures, including peer pressure."  Id.  "This is explained in part," the Court stated, "by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment."  Id. (emphasis added).

- 17 -

"The third broad difference," the Court explained, "is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." Id. at 570. And the Court proceeded to note that juveniles' "own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." Id. Consequently, the Court stated, "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." Id.

### 2) The OCCA's second factual error

The second factual error made by the OCCA was its finding that Grant, as an adult, "had no meaningful contact with the family members who would have testified" on his behalf. Grant I, 58 P.3d at 800. Shortly after Grant turned eighteen (in 1979), he was convicted of a felony in Oklahoma state court and sentenced to a term of imprisonment. While he was confined, his mother, Ruth Grant, moved from Oklahoma City to Portland, Oregon, and most of Grant's siblings moved with her. In 1980, Grant was released on parole, but soon thereafter committed several armed robberies in Oklahoma. Grant, who was then nineteen years of age, was convicted of those crimes in November 1980 and sentenced to a total term of imprisonment of 130 years in the custody of the Oklahoma Department of Corrections. Consequently, it became difficult for

Grant's family, living in Oregon and of very modest means, to personally visit him in prison in Oklahoma. Nevertheless, according to her testimony at the state evidentiary hearing, Ruth Grant returned to Oklahoma every year to visit Grant in prison (except for one year when Grant had been transferred to a facility in Texas). Ruth Grant further testified that she regularly wrote to Grant in prison, and that he had also written to her. At least four of Grant's siblings (LaRonda Joy Hovis, Ruth Ann Grant Burley, Andrea Jean Grant, and O. C. Frazier) testified that they also corresponded with Grant in prison or talked to him by telephone. Lastly, Grant's uncle, Clayton Black, testified that he visited Grant once or twice per year in prison, and would drive Grant's mother to the prison for her annual visit with Grant. Thus, in sum, the evidentiary hearing record established that Grant had several family members, including his mother, who maintained regular contact with him.

*3) The OCCA's third factual error*

The third factual error committed by the OCCA was its finding that the testimony of Grant's family members "would have repeated Grant's own account of his childhood." Grant I, 58 P.3d at 800. Grant testified on his own behalf during the sentencing-phase proceedings. During his testimony on direct examination, Grant noted that he had five brothers and three sisters and that he was "somewhere in between" in terms of his age. Trial Tr. at 1565. Grant did not testify at all regarding the events of his childhood from birth until age twelve.

Instead, his testimony focused very briefly on the period of his life from age twelve, when he first left home, until age seventeen, when he left home for good. Grant testified that during that time period he got into trouble as a juvenile and was sent to different juvenile facilities. The remainder of Grant's testimony on direct examination focused on his criminal activities as an adult and his purported lack of recollection of murdering Carter. Quite clearly, Grant's testimony failed to provide the jury with any details of his childhood or the difficulties he faced as a child. Thus, contrary to the OCCA's findings, the testimony of Grant's family members would not simply have repeated Grant's own account of his childhood, and instead could have provided the jury with important mitigating evidence.

*4) The OCCA's fourth factual error*

The OCCA's fourth factual error was its finding that the testimony of Grant's family members "would have been cumulative to each other." Grant I, 58 P.3d at 799. To be sure, there was some overlap in the testimony provided by Grant's family members at the state evidentiary hearing. But a careful review of that testimony indicates that each of Grant's family members provided specific details not testified to by anyone else. For example, LaRonda Joy Hovis, the oldest of Grant's female siblings, was the only witness who specifically described the living conditions her family faced prior to their move to Oklahoma City. According to Hovis, her family (including at that time Grant's father and two oldest brothers) lived in a three-room house in Ada, Oklahoma, that lacked

- 20 -

plumbing.  Another significant example came from the testimony of Grant's younger sister, Andrea Jean Grant.  She testified that, as a child, Grant stole in order to provide clothing and shoes for his younger siblings.

    *5) The OCCA's fifth factual error*

    The fifth factual error committed by the OCCA was its finding that trial counsel's "knowledge of Grant's early life, through conversations with Grant, would not have been enhanced by interviewing [Grant's] family members."  Grant II, 95 P.3d at 181.  At no point during the state evidentiary hearing did Bowen, Grant's lead trial counsel, testify that he spoke with Grant about the details of "Grant's early life."  Nor did Bowen describe any of those details.  Instead, Bowen's testimony suggests that any facts he learned about Grant's childhood came primarily, if not exclusively, from the defense's guilt-phase expert witness, psychologist Dean Montgomery.  And even those details, according to the trial transcript, were far from complete.[4]  Thus, in short, there is no evidentiary basis to support the OCCA's finding on this point.[5]

---

    [4] The majority also references Montgomery, albeit not by name but rather by the term "guilt stage expert," and suggests that Montgomery "talked about [Grant's] difficult childhood."  Maj. Op. at 31.  A careful examination of Montgomery's testimony, however, indicates that he provided only minimal details about Grant's childhood (e.g., the fact that Grant was the sixth of nine children and never really knew his father).

    [5] Somewhat relatedly, Bowen's testimony at the state evidentiary hearing also established that he had a significant misunderstanding of how frequently Grant's family members had contact with Grant in prison.  For example, it was

(continued...)

- 21 -

*6) The OCCA's sixth factual error*

The sixth factual error committed by the OCCA was its finding that Bowen "followed the directions of his client" and did not contact Grant's family members. Grant II, 95 P.3d at 181. During the state evidentiary hearing, Bowen testified that during their pretrial conversations, Grant "indicated . . . that he really didn't want his family to be involved." Tr. of Evid. Hr'g, at 54. But Bowen proceeded to testify, "I don't normally, I don't take that into consideration what the Defendant in a Capital murder case wants with regard to those kind of issues. We would still follow-up as far as trying to find family and getting information independently." Id. at 58. In other words, Bowen testified, Grant's "reluctance about getting his family involved did not deter me from attempting to — from directing my investigator to attempt to contact his family."[6] Id. at 61. And Bowen explained that he ultimately did not call any of Grant's family members to testify during the sentencing-phase proceedings because "as hard as

---

[5](...continued)
Bowen's understanding that Grant's mother "had come to see him just a few times while he was incarcerated." Tr. of Evid. Hr'g, at 55. But the record firmly establishes that Ruth Grant visited Grant on an annual basis (with the exception of one year when he was confined in a facility in Texas).

[6] The state trial court expressly found, after hearing this testimony, that Grant did not waive the presentation of mitigating evidence from his family members. And, as Judge Chapel aptly noted in his dissent, "[t]he record suggests that rather than deciding not to pursue mitigating evidence about Grant's early life from members of his family, Grant's counsel recognized that such information was relevant and potentially helpful, he just never accomplished the task of actually obtaining it." Grant II, 95 P.3d at 188.

- 22 -

we [Bowen and his investigator] tried we really couldn't find them [Grant's family members]," and because Grant "really hadn't had any contact with them to speak of in over twenty years." Id. at 56. But the record on appeal clearly indicates that both of these purported excuses are without support. In fact, Grant's family was easy to locate using information culled from Grant's prison records, and Grant's family did have contact with him during the twenty-plus years he was imprisoned.

*7) The OCCA's resulting legal error*

As I have noted, the OCCA ultimately concluded that Grant could not satisfy the first prong of the Strickland test because Bowen "made a reasonable decision that investigation into Grant's family history by contacting family members was unnecessary." Grant II, 95 P.3d at 181. But the above-outlined factual errors, upon which the OCCA's legal conclusion was based, render the legal conclusion itself unreasonable. As noted, Bowen did not decide to forego investigation into Grant's family history. Rather, he and his investigator were purportedly unable to locate any of Grant's family members, even though Grant's post-trial OIDS investigator had no problem locating Grant's family members using the exact same information that was available to Bowen and his investigator prior to trial. And this failure to contact Grant's family members left Bowen with insufficient information upon which to decide whether the testimony of Grant's family members would be beneficial to Grant during the sentencing-phase

- 23 -

proceedings. Moreover, to the extent Bowen based his decision not to call family members on Grant's purported lack of contact with them, Bowen clearly lacked sufficient and accurate information on that issue. As previously discussed, several of Grant's family members, most notably his mother, testified that they regularly visited or communicated with Grant in prison. Thus, in short, Bowen lacked sufficient information to make an informed and reasoned decision about what evidence to present or forego at the sentencing proceedings.

*8) De novo review of the first prong of <u>Strickland</u>*

Reviewing de novo the first prong of the <u>Strickland</u> test, it is clear, and the State effectively concedes, that Bowen's performance was deficient. As the Supreme Court stated in <u>Strickland</u> and reemphasized in <u>Wiggins</u>, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Wiggins</u>, 539 U.S. at 521 (internal quotation marks omitted). In this case, the factual record fully exposes Bowen's failure to conduct an adequate investigation of Grant's family history, and thus he was completely unaware of critical mitigating information that Grant's family members could have provided. Consequently, Bowen's decision as to what evidence he would present during the sentencing-phase proceedings was in turn fundamentally flawed and cannot be labeled a "strategic choice." As Judge Chapel aptly noted in <u>Grant I</u>, "counsel cannot 'reasonably' decide not to present a particular type of mitigating evidence

. . . if counsel does not first discover and develop such evidence to some degree, such that its potential impact can be understood and realistically evaluated." Grant I, 58 P.3d at 803. Thus, as Judge Chapel further noted, Bowen "could not have reasonably decided that testimony from members of Grant's family would not be helpful, unless he had first located and interviewed at least some of them." Id. at 806. And Bowen's failure in this regard is even more egregious in light of the fact that there appear to have been no other compelling mitigation strategies available to him. See Grant II, 95 P.3d at 189 (Chapel, J., dissenting) (noting that, unlike in Wiggins, Bowen could not have attempted to convince the jury in the sentencing-phase proceedings that Grant was not responsible for Carter's murder, nor could Bowen point to Grant's lack of a prior criminal history).

B. *The prejudice prong of the Strickland test*

That leaves the key question of whether Grant was prejudiced by the failure of his trial attorneys to investigate and present mitigating evidence from his family members. The OCCA purported to address this question on the merits in both Grant I and Grant II. In Grant I, the OCCA summarily concluded that "[e]ven if [Grant] had shown deficient performance, [he] could not show that he was prejudiced by the failure to present this evidence." 58 P.3d at 800. In Grant II, the OCCA expanded slightly upon this conclusion, stating:

> There is no indication that had the jury been confronted with the testimony of family members the result of this proceeding would have been different. The jury found the existence of three

- 25 -

aggravating circumstances. Grant was incarcerated for committing violent crimes. He violently and repeatedly stabbed a civilian kitchen worker while he was serving a sentence for a violent crime. The testimony of Grant's family members would not have swayed the jury from imposing the death penalty.

95 P.3d at 181 (footnote omitted).

Like its analysis of Strickland's first prong, however, the OCCA's analysis of Strickland's second prong was unquestionably impacted by its erroneous factual findings. Because the OCCA erroneously found that the testimony of Grant's family members "would [simply] have repeated Grant's own account of his childhood," Grant I, 58 P.3d at 800, it is not surprising that the OCCA in turn concluded that Grant was not prejudiced by Bowen's failure to present that testimony during the sentencing-phase proceedings. But, as I have already explained, the record on appeal firmly establishes that the testimony of Grant's family members would have expanded greatly upon "Grant's own account of his childhood." Id. Because the OCCA fundamentally misunderstood, and effectively discounted, the mitigating testimony that could have been presented by Grant's family members, the OCCA's adjudication of the second prong of the Strickland test was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), and thus we are obligated to review that prong de novo. See Wilson v. Workman, 577 F.3d 1284, 1303 (10th Cir. 2009) (reviewing de novo petitioner's ineffective

assistance claim after first determining that OCCA's decision was based on an unreasonable determination of the facts).

In examining the constitutionality of capital sentencing proceedings, the Supreme Court has stated that "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976). This, the Court has held, ensures that "the sentence imposed at the penalty stage . . . reflect[s] a reasoned moral response to the defendant's background, character, and crime." Abdul-Kabir v. Quarterman, 550 U.S. 233, 252 (2007) (internal quotation marks and emphasis omitted). The Court has also emphasized that "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." Lockett v. Ohio, 438 U.S. 586, 605 (1978). That is because, the Court has explained, "[t]he nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence." Id. And, consistent with these principles, the Court has held that, "[i]n assessing prejudice" de novo, "we [must] reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.

In conducting the mandated reweighing in this case, I agree with the following statement from Judge Chapel's dissent in Grant II:

> The question is not whether Grant's background, family history, and some of his positive traits could excuse his cruel murder of Gay Carter. They certainly could not. The question is whether there is a "reasonable probability" that at least one juror—and it would only take one—could be sufficiently moved by the circumstances of Grant's life to choose to spare that life from execution.

95 P.3d at 190.

Notably, Judge Chapel, in his dissent in Grant I, accurately described the mitigating testimony that Grant's family members could have offered at the sentencing-phase proceedings:

> The family members painted a rather depressing picture of the circumstances into which Grant was born and in which he grew up. John Marion Grant was the sixth of nine children and the last fathered by his mother's former husband, Walter Grant.FN23 Walter left the family home in Ada, Oklahoma approximately one month before John was born, leaving Ruth with six children to raise on her own. Walter moved to Los Angeles and never provided any financial support to Ruth or the children. Although the two oldest brothers eventually went to live with Walter in Los Angeles, Grant was left in Oklahoma and had very little contact with his father while he was growing up.
>
> > FN23. The children born to Ruth and Walter Grant, in the order of their birth, were Kenneth, Ronnie, LaRonda, Ruth Ann, Norman, and John.
>
> During the three years following Walter's departure and Grant's birth, Ruth had three more children (Andrea, Gregory, and O.C.), the last of which was named after their father, O.C. Frazier. O.C. Frazier never lived in Ruth's home with the children, and John never experienced having a male role model in the family home. Instead, the two oldest sisters in the family were expected to play very

substantial roles in running the home and raising and disciplining the younger children, including Grant, even while they were still children themselves.

Ruth's only sources of income to support her large family were Aid to Dependent Children and some part-time work cleaning people's homes. LaRonda described their family as "dirt poor, extremely poor." The first family home in Ada had only three rooms and no indoor plumbing, and the family did not own a car. When Grant was approximately five years old, the family moved to Oklahoma City, where they lived next door to Ruth's brother, Clayton Black. Black lived across the street from some apartment buildings that were known as "the projects," and Ruth and the children eventually moved into these apartments. Family members testified that things got even worse in the new neighborhood, which was poor, tough, crime-ridden, run down, and dangerous, particularly in the projects. In 1979, Ruth and the children who were still in the home moved to Portland, Oregon to escape the neighborhood. Grant was unable to go with the family, however, because he was confined to a juvenile facility at the time.

The family members described Grant as being "sweet," "loving," "quiet," "sensitive," and "gentle" when he was a child. He loved animals and pets, especially dogs. Some of Grant's sisters testified that he did not get much attention from their mother and that he needed more love than he got. Many of the family members remembered Grant crying a lot as a child. Ruth noted that Grant first started having problems and getting into trouble when the city started busing the children to schools outside the neighborhood. Some of Grant's siblings testified that when Grant first started stealing as an adolescent, he was stealing things like clothing and shoes for the younger children in the family.

Grant's younger siblings testified that he was very protective of them and that he would come to the aid of his younger brothers when older boys in the neighborhood threatened them or tried to fight them. Gregory testified that Grant gave him "quite a bit of advice growing up" and that Grant attempted to steer him away from some of the "badder guys" in the neighborhood. He stated that even though Grant did not follow his own good advice, "he pretty much wanted to make sure that the people who were younger or his beloved brothers didn't get into the type of lifestyle he got into."

- 29 -

Andrea testified that Grant was her "favorite brother" and that they were very close as children. O.C. likewise described Grant as a "cool brother" who was always there for him and who helped him out a lot.

LaRonda testified that Grant once helped her escape from an abusive boyfriend and that she was very touched by the concern he showed for her and her children at that time. Gregory testified that Grant always loved small children, particularly his nieces and nephews. And all of the family members testified that Grant was never violent or verbally abusive within the family, even as an adolescent.

The family members also testified that they stilled loved Grant and that they would like the opportunity to maintain or renew their relationships with him. Some expressed regret about their failure to provide Grant with more support. All of the family members testified that if they had been given the opportunity to testify at Grant's trial, they would have asked the jury to spare his life.

Grant I, 58 P.3d at 807-08 (internal paragraph numbers omitted).

To be sure, none of this evidence would have squarely rebutted the three aggravating factors alleged by the prosecution and found by the jury. But a death sentence is not imposed simply by assessing the presence or absence of aggravating circumstances. The question of a defendant's moral culpability, for example, is a factor that has been repeatedly emphasized by the Supreme Court as one that can "provide [a] jury with an entirely different reason for not imposing a death sentence." Abdul-Kabir, 550 U.S. at 259. And the Supreme Court has quite clearly held that a defendant's "childhood deprivation," id., or "troubled history," Wiggins, 539 U.S. at 535, is "relevant to assessing [his or her] moral culpability." Id.

In Grant's case, his jury, due to the decisions of his trial counsel, was given very little information about Grant's background and character. The jury did not hear from, nor even see, Grant's family members. The jury was truly left with the impression that no one cared whether Grant lived or died. Although Grant's counsel urged the jury during sentencing-phase closing arguments to "look at . . . Grant as something other than a monster," Trial. Tr., Vol. VI at 1612, the jury in fact had no information that would have allowed it to do so. And the prosecution seized upon this lack of evidence during its sentencing-phase closing arguments, implying falsely that there was really no explanation for Grant's criminal history other than his own conscious and knowing choices. Id. at 1608 ("He simply has chosen not to abide by the rules that we all abide by."), 1613 ("He's chosen consciously to break the law and his history shows that pattern of decision after decision after decision. . . . He's made bad choices. Some people just do that."). As a result, Grant's jury was in no position to adequately assess his moral culpability, nor in turn fully engage in what the Supreme Court has described as "the process of inflicting the penalty of death." Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) (internal quotation marks omitted).

Even if we assume, as the majority suggests, that the mitigating evidence that Grant's family members would have provided is less persuasive than the "powerful" mitigating evidence at issue in Wiggins (which included "severe privation and abuse in the first six years of [Wiggins's] life while in the custody

- 31 -

of his alcoholic, absentee mother," and "physical torment, sexual molestation, and repeated rape during his subsequent years," Wiggins, 539 U.S. at 535), I agree with Grant that Wiggins and cases like it "only give general guidance as to the types of evidence that constitute powerful and compelling mitigation evidence" and "which lessen the moral culpability of a capital defendant." Aplt. Reply Br. at 14. As previously stated, federal law entitles every capital defendant to individualized sentencing. Lockett, 438 U.S. at 604-05 (holding that individualized consideration of a capital defendant must take place to ensure the constitutional imposition of the death penalty).

Had Grant actually received the individualized consideration that the Constitution entitles him to, I believe that the testimony of Grant's family members would have placed not only the murder, but Grant's entire criminal history, into a different, and more sympathetic context for the jury. Specifically, the testimony of Grant's family members suggests that Grant's first forays into crime were a product of the difficult environment in which he and his siblings were living, which included a lack of even the most basic of life's necessities. Indeed, the evidence suggests that Grant, who effectively acted as a caretaker for his younger siblings, began stealing to provide them with clothing and shoes. In turn, the testimony of Grant's family members suggests that Grant's experiences in juvenile facilities hardened him and likely lead to his committing crimes as a young adult. And, tragically, those crimes lead to him being sentenced at the age

of nineteen to a life in prison.  Of course, none of this evidence explains precisely why Grant killed Carter, nor does it excuse the murder.  But, "[h]ad the jury been able to place [Grant's] . . . life history on the mitigating side of the scale," I believe "there is a reasonable probability that at least one juror would have struck a different balance" and decided that life imprisonment was a sufficient penalty for the murder.  Wiggins, 539 U.S. at 537.  Consequently, I conclude that Grant is entitled to federal habeas relief in the form of a new sentencing proceeding that satisfies the constitutional standards outlined by the Supreme Court.